KONNIE SUTHERLAND,          )
                           )
          Plaintiff        )
                           )
     v.                    ) CIVIL NO. 2:11 cv 24
                           )
MICHAEL J. ASTRUE, Commissioner, )
Social Security Administration,  )
                           )
          Defendant        )

## OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the claimant, Konnie Sutherland, on January 18, 2011.
For the reasons set forth below, the decision of the Commissioner
is **AFFIRMED.**

## Background

The claimant, Konnie Sutherland, applied for Supplemental
Security Income on February 26, 2007, alleging a disability onset
date of October 1, 2005.  (Tr. 110, 194-95)  Her claim initially
was denied on September 27, 2007, and again denied upon reconsid-
eration on December 28, 2007.  (Tr. 148, 154) Sutherland re-
quested a hearing before an Administrative Law Judge ("ALJ").  A
hearing was held before ALJ Steven J. Neary on June 5, 2009, at
which Sutherland and vocational expert Joseph Thompson testified.
(Tr. 124)

On November 3, 2009, the ALJ issued his decision denying benefits. (Tr. 118) The ALJ found that Sutherland was not under a disability within the meaning of the Social Security Act from February 26, 2007, through the date he issued his decision. (Tr. 118) Following a denial of Sutherland's request for review by the Appeals Council, she filed a complaint with this court. (Tr. 1)

Sutherland was 48 years old on the date of the ALJ's decision. She is 5'7" and weighs approximately 165 pounds. (Tr. 126) Sutherland is single and resides with her boyfriend and her daughter. (Tr. 127) Sutherland's relevant work history includes work as a nurse's aide at the Macon County Nursing Home. (Tr. 128) Sutherland left the Macon County Nursing Home due to shoulder and back pain and took a job at Big Lots. (Tr. 128) She left Big Lots for higher wages at Wal-Mart. (Tr. 127) At Wal-Mart, Sutherland worked as an associate in the pet department. (Tr. 127) The record also reflects that Sutherland worked at her sister's farm in exchange for free room and board from approximately September 2006 through at least July 2010. (Tr. 74, 752) Some activities Sutherland performed on the farm included riding horses, washing horses, training horses, otherwise generally caring for animals, lifting bales of hay, using a chainsaw on downed trees, and doing general maintenance work.

(Tr. 327, 485, 547, 703, 707)  However, Wal-Mart was Sutherland's last place of verifiable employment.

Sutherland experienced chronic right shoulder and back pain for several years before she underwent a total arthroplasty of her right shoulder on February 1, 2006.  (Tr. 260) Subsequent to this procedure, Sutherland continued to experience episodes of dislocation and ongoing pain in her right shoulder.  (Tr. 367, 382-384, 399, 406-07, 415, 422-424, 467, 615, 783)  On June 25, 2007, Dr. Ralph Inabnit examined Sutherland and concluded that the prior arthroplasty of the right shoulder had failed due to chronic dislocation and subluxation.  (Tr. 593)  Dr. Inabnit diagnosed Sutherland with chronic right shoulder pain, chronic dislocation of the right shoulder, history of cervical spine spondylosis, chronic back pain, osteoarthritis of the lumbar spine, and L4/L5 left paracentral disc protrusion.  (Tr. 595)

In January 2008, Sutherland began treatment with Dr. Timothy Ames for chronic back and shoulder pain.  (Tr. 716, 723)  On November 25, 2008, Dr. Ames assigned restrictions to Sutherland as follows:  restricted lifting to ten (10) pounds; standing and walking limited to less than two (2) hours in an eight (8) hour day with periodic sitting and standing required; limited pushing and pulling in both upper and lower extremities; limited postural activities to occasional or never; and manipulative limitations

3

due to failed right shoulder arthroplasty. (Tr. 776-779)  In February 2009, Sutherland began treatment with Dr. Sudhakar Garlapati. (Tr. 820)  Dr. Garlapati also assigned restrictions substantially similar to those given by Dr. Ames. (Tr. 815-817)

Sutherland began treatment for various mental health issues on March 3, 2008. (Tr. 703-706, 710)  Sutherland reported that her mental health issues stemmed from stressors arising from her physical problems, financial problems, a history of physical and sexual abuse, her daughter's immigration process delay, and her brother's death.  These stressors caused crying spells, mood swings, nightmares, and flashbacks of her father's suicide. (Tr. 703)  While treating with Porter-Starke Services, she initially was diagnosed with Major Depressive Disorder, Recurrent, severe, without psychotic features, and Post-Traumatic Stress Disorder. (Tr. 703-712)  Sutherland was assigned a GAF score of 35 and remained hospitalized for three (3) days. (Tr. 705)  On March 20, 2008, Sutherland was administered a psychiatric evaluation and assigned a GAF score of 40 (Tr. 831)

On April 21, 2008, Sutherland underwent another psychiatric evaluation and was assigned a GAF score of 45 to 50. (Tr. 703-04)  Sutherland's treating physician, Dr. Daniel Kim, found her oriented to three spheres, her memory intact, and her intelligence in the average range. (Tr. 704)  That evaluation also

4

reflected a diagnosis of Major Depressive Disorder and Post-Traumatic Stress Disorder with Borderline Personality Disorder. (Tr. 703-04)

During May 2008, Sutherland continued psychiatric treatment with Dr. Kim and reported that she felt better since her previous visits. (Tr. 750-51) Dr. Kim noted that medication helped her and that her anxiety and frustration were decreasing. (Tr. 751) Dr. Kim further noted that Sutherland was improving outwardly and that she felt better and more positive. (Tr. 751) On July 3, 2008 and September 8, 2008, Dr. Kim observed that Sutherland was stable and euthymic. (Tr. 752) In October 2008, a social worker noted Sutherland's lack of follow-through with treatment and advised Sutherland that she needed to be consistent on a biweekly basis to experience progress with treatment. (Tr. 766)

On August 27, 2009, Sutherland received a Medical Source Statement from Dr. Kim. (Tr. 849) Dr. Kim noted that Sutherland had marked impairments in her ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the public, supervisors, or co-workers, and respond appropriately to work pressures in a usual work setting. (Tr. 849-851) Dr. Kim also noted that Sutherland "has been unable to hold any gainful job due to her emotional lability" and that she did not abuse alcohol or drugs. (Tr. 849-851) On

September 20, 2010, Dr. Kim issued an updated report showing no changes from his August 27, 2009 report. (Tr. 8)

At the hearing before the ALJ, Sutherland testified that her right shoulder and back hurt "all of the time." (Tr. 128) Sutherland further testified that she had short term memory loss and could not "remember a lot of things." (Tr. 136, 138) Sutherland also testified that she had trouble concentrating and jumped from subject to subject. (Tr. 136) When asked how she spent her days, Sutherland responded that she watched television, drew, gardened, and did household chores. (Tr. 132-33) Sutherland testified that her ability to conduct these activities was limited by lifting restrictions and her inability to stand or sit at length. (Tr. 131-133) Sutherland acknowledged that she loved to work with horses but that her doctors advised her to stop. (Tr. 131-32) Sutherland testified that she stopped working at her sister's farm several months prior to the hearing but continued to brush the horses as a means of therapy. (Tr. 132)

Vocational Expert Thompson was last to testify. (Tr. 141) The ALJ posed a hypothetical question asking what work was available in the national economy for an individual 48 years old with a high school education and no prior work history and limitations which included: work at the sedentary exertional level; occupations which did not require climbing or crawling and

did not require more than occasional balancing, stooping, kneeling, and crouching; and occasional reaching with the right arm. (Tr. 142) The VE testified that such a person could perform the sedentary, unskilled jobs of telephone clerk (2,500 statewide), surveillance monitor (3,000 statewide), and order clerk (3,000 statewide). (Tr. 142)

The ALJ then asked the VE to consider the limitations of an individual the same age, education and work history, and who had limitations consistent with Sutherland's testimony. (Tr. 142) The VE noted Sutherland's pain reports, difficulty with sustained activity, need for breaks, and the need to lie down for one hour at least four times a week, and he concluded that all employment would be eliminated. (Tr. 142-43) Upon further questioning by Sutherland's attorney, the VE acknowledged that his conclusion did not take into consideration psychological limitations. (Tr. 143) Sutherland's attorney then asked the VE to consider the additional limitations of a marked impairment in the ability to concentrate, stay on task, and remember simple or detailed instructions. The VE concluded that such limitations would indicate an inability to complete unskilled tasks and would eliminate employment. (Tr. 143)

At step two, the ALJ also found that Sutherland's mental impairments of depression and post-traumatic stress disorder were

non-severe because they did not cause more than a minimal limitation in her ability to perform basic mental activities. In making this determination, the ALJ considered the four broad functional areas for evaluating mental disorders known as the "Paragraph B" criteria. (Tr. 113) For the first functional area, the ALJ found that Sutherland has no limitations affecting the activities of daily living. The ALJ noted that Sutherland spent her days taking care of horses, engaging in art, and partaking in gardening activities. (Tr. 113) For the second functional area, the ALJ found Sutherland to have a mild limitation on social functioning. The ALJ noted that Sutherland lived with her daughter and boyfriend and that, although there were some reports of anger, there were no reports that Sutherland had difficulty getting along with others. (Tr. 113) For the third functional area, the ALJ found that Sutherland had no limitation regarding concentration, persistence, or pace. The ALJ discussed Sutherland's alleged memory loss but noted that it was inconsistent with the record. (Tr. 113) For the fourth functional area, the ALJ found that Sutherland experienced no episodes of decompensation. The ALJ acknowledged that Sutherland had been voluntarily admitted to the hospital for mental health treatment, but he noted it as an isolated occurrence of limited duration. (Tr. 113)

At step three, the ALJ found that Sutherland's impairments did not meet or medically equal one of the listed impairments. In particular, Sutherland's shoulder problem did not meet or medically equal the Listing 1.02 impairment and her back condition did not meet or medically equal Listing 1.04. (Tr. 114) In determining Sutherland's RFC, the ALJ stated that he considered the entire record and found that Sutherland had the capacity to perform sedentary work but could not climb or crawl; no more than occasionally balancing, stooping, kneeling, and crouching; and only occasional reaching with the right arm. (Tr. 114)

In reaching this determination, the ALJ first considered all symptoms and the extent to which those symptoms reasonably could be accepted as consistent with the objective medical evidence, as well as opinion evidence presented. In considering Sutherland's symptoms, the ALJ first determined whether there was any underlying medically determinable physical or mental impairment(s) that could produce Sutherland's pain or symptoms. (Tr. 114) The ALJ explained that Sutherland's daily activities, including household chores, caring for her hygiene, drawing and working on horses, were inconsistent with her complaints of pain. (Tr. 115) The ALJ determined that Sutherland's testimony regarding her pain and symptoms were exaggerated as compared to the medical records and testimony presented and found that Sutherland's testimony was not

credible to the extent that it was inconsistent with the RFC assessment. (Tr. 115-16) The ALJ did not specifically discuss Sutherland's mental impairments under Step 4, however, under Step 2, the ALJ stated, "the following residual capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental functional analysis. (Tr. 114)

At step four, the ALJ determined that Sutherland had no past relevant work. Additionally, the ALJ found that Sutherland had at least a high school education and was able to communicate in English. (Tr. 117) At step five, the ALJ considered Sutherland's age, education, work experience, and RFC to find that there were unskilled jobs that exist in significant numbers in the national economy that Sutherland could perform, including jobs of telephone clerk (2,500 in the State of Indiana), surveillance monitor (3,000 statewide), and order clerk (3,000 statewide). (Tr. 117)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g)("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");

*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972) (*quoting* **Consolidated Edison Company v. NLRB**, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regula-

tions enumerate the five-step sequential evaluation to be fol-
lowed when determining whether a claimant has met the burden of
establishing disability.  20 C.F.R. §416.920.  The ALJ first
considers whether the claimant is presently employed or "engaged
in substantial gainful activity." 20 C.F.R. §416.920(b).  If she
is, the claimant is not disabled and the evaluation process is
over.  If she is not, the ALJ next addresses whether the claimant
has a severe impairment or combination of impairments which
"significantly limits . . . physical or mental ability to do
basic work activities."  20 C.F.R. §416.920(c).  Third, the ALJ
determines whether that severe impairment meets any of the im-
pairments listed in the regulations.  20 C.F.R. §401, pt. 404,
subpt. P, app. 1.  If it does, then the impairment is acknowl-
edged by the Commissioner to be conclusively disabling.  However,
if the impairment does not so limit the claimant's remaining
capabilities, the ALJ reviews the claimant's "residual functional
capacity" and the physical and mental demands of her past work.
If, at this fourth step, the claimant can perform her past rele-
vant work, she will be found not disabled. 20 C.F.R. §416.920(e).
However, if the claimant shows that her impairment is so severe
that she is unable to engage in her past relevant work, then the
burden of proof shifts to the Commissioner to establish that the
claimant, in light of her age, education, job experience and

functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §416.920(f).

Sutherland raises four challenges to the ALJ's denial of disability benefits: whether his determination that Sutherland's mental impairments were not severe under Paragraph B was supported by substantial evidence; whether the ALJ failed to consider all the relevant evidence in the record; whether the ALJ gave proper weight to Sutherland's treating physician's opinion; and whether the ALJ failed to provide a proper hypothetical question to the vocational expert.

Section 12.00(A) of the Social Security Regulations describes the structure of the Mental Disorder Listings.  For a claimant to show that she meets a listed impairment, she must demonstrate that her impairment meets each required criterion, and she bears the burden of proof in showing that her condition qualifies. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). A condition that meets only some of the required medical criteria, "no matter how severely," will not qualify as meeting a listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  To show that she meets the Mental Disorder Listing, the claimant must submit a set of medical findings that support a diagnosis of one of the listed medical impair-

ments.  After the claimant has met this burden, the court must assess the severity of the impairment under Paragraph B.  20 C.F.R. §404.1520a(a).

Paragraph B sets forth the impairment-related functional limitations that are incompatible with the ability to do any gainful activity.  The claimant's functional limitations are assessed by using the four criteria set forth in Paragraph B of the listings: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Listing 12.00(C); 20 C.F.R. §404.1520a(c)(3).  Each functional limitation must be evaluated to determine the severity, taking into consideration "all relevant and available clinical signs and laboratory findings, the effects of [the] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment."  20 C.F.R. §404.1520a(c)(1).  If the degree of limitation is none or mild in the first three categories and none in the fourth, the impairment is not severe.  20 C.F.R. §404.1520a(d)(1).  Otherwise, the court will proceed to determine whether the claimant meets the criteria set forth by the Listing for the specific mental impairment for which she was diagnosed.

In this case, the ALJ conducted a complete examination at each of the four steps of the Paragraph B analysis.  As for the first criterion, Sutherland's daily living, the ALJ pointed to evidence in the record that indicated she regularly took care of horses, worked on her sister's farm, and maintained hobbies. Sutherland's very own statements, both to her doctors and the ALJ during the hearing, indicated that she was capable of participating in daily activities.  Sutherland testified that she could perform household chores, cook, and care for her personal hygiene.  Nothing in the record suggested that Sutherland's mental impairment limited her ability to perform activities of daily living.

For the second criterion, the ALJ found only a mild limitation on Sutherland's social functioning because she was able to maintain a relationship with both her boyfriend and her daughter. Furthermore, Sutherland's medical records lacked any basis for concluding she had difficulty maintaining social interaction. The ALJ acknowledged that there were several references in the medical records to Sutherland feeling angry, but no reports that this anger rose to a level that interfered with her social abilities.  In fact, Dr. Kim noted that Sutherland was "improving outwardly" and feeling more positive.  The record reflects that the ALJ considered this evidence and weighed it accordingly.  It

is not the duty of the court to reweight the evidence.  Rather, the court must consider whether the ALJ relied on substantial evidence of record, and here the ALJ supported his decision with evidence from Sutherland's testimony and the medical record.

With regard to the third criterion, the ALJ acknowledged that Sutherland reported some memory loss during treatment. However, the ALJ also noted evidence in the record that Dr. Kim found Sutherland to be oriented three times and her memory intact.  Although there was an inconsistency, the ALJ explained that Sutherland's condition was improving and that the most recent notes suggested Sutherland did not have marked limitations in this category.  Therefore, his conclusions were substantiated.

As for the fourth criterion, episodes of decompensation, Sutherland was admitted to a hospital for her psychiatric problems.  However, the ALJ explained that this was an isolated incident which was voluntary and of a short duration (3 days). Also, this incident occurred shortly after she first sought treatment for her mental health.  Outside of this initial voluntary hospitalization, there were no other reports in the medical records that indicated decompensation occurred.

Although Sutherland was able to point to some evidence that may support a contrary finding, the ALJ is not required to accept this evidence as conclusory.  Rather, substantial evidence sup-

ported the ALJ's conclusion that Sutherland's condition did not satisfy the Paragraph B Listing. The record is devoid entirely of evidence that Sutherland experienced difficulty with activities of daily living or interacting with others. Dr. Kim's examination notes corroborated the ALJ's finding that Sutherland was oriented. Sutherland did not have any ongoing memory loss or disorientation of record. The ALJ relied on the absence of medical records to show that Sutherland's condition did not cause decomposition to the extent required to meet the Listing. Sutherland was able to point to only one event - her short voluntary stay at the hospital - to support her position. However, the medical records show that her mental condition improved and did not impose limits on her ability to function. The ALJ supported his conclusion with substantial evidence by pointing to Sutherland's testimony, the medical evidence, and the absence of records suggesting to the contrary. Although Sutherland can point to conflicting evidence, the record reflects that the ALJ properly weighed the evidence and fully supported his conclusion.

Second, Sutherland contends that the ALJ failed to consider all the relevant evidence in the record. Sutherland claims the ALJ selectively read the medical records and pulled out only those facts which substantiated his conclusory findings. In turn, this selective reading caused the ALJ to ignore the psychi-

atric evidence in Step 4 of the sequential analysis. It first should be noted that the ALJ expressly incorporated his Step 2 findings into his Step 4 analysis. That is to say, the ALJ did not find that Sutherland's mental impairments rose to the level necessary for consideration during Step 4.

In support of her argument, Sutherland first directs the court to portions of her doctor's notes that the ALJ omitted from his discussion. Sutherland points to an evaluation from March 4, 2008, which states that Sutherland reported a history of multiple suicide attempts, including an attempt to stab and an attempt to hang herself. The ALJ also omitted language from Dr. Kim's evaluation explaining that Sutherland had flashbacks of her father's death, nightmares, sometimes wanted to die, and sometimes had difficulty controlling her anger, but included positive notes from the same examination. Additionally, Sutherland criticizes the ALJ for noting improvement in her mental condition by pointing to notes showing regression of her condition. The ALJ also failed to make any mention of Sutherland's GAF scores.

While it is true that an ALJ must confront the evidence that does not support his conclusion and explain why it was rejected, the ALJ need not discuss every piece of evidence in the record. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)*; Kasarsky v. Barnhart,* 335 F.3d 539, 543 (7th Cir. 2003); **Brindisi v. Barnhart,**

315 F.3d 783, 786 (7th Cir. 2003).  Here, the ALJ supported his findings with Dr. Kim's medical notes, discussed Sutherland's improvement over the course of treatment, and engaged in discussion of the inconsistencies between Sutherland's reported activities and reported effects of her psychiatric condition.  Although the ALJ did not specifically cite the language from the medical notes Sutherland cites in her brief, the record reflects that he took these notes into consideration.  For example, the ALJ cited the April 21, 2008 report that indicated Sutherland was "oriented times three" to support his finding that she was able to concentrate.  This was used to explain why he rejected Sutherland's previous statement that she had memory issues.  The same report also contained Dr. Kim's findings that Sutherland was "impulsive and angry, [struggling] to control her temper."  Although the ALJ did not cite this language directly, it is clear in his opinion that he considered it because he noted that "there are some references to anger" in the record.  Although the ALJ did not cite the cause of Sutherland's anxiety, he acknowledged that she experienced difficulty sleeping, but he explained that her sleep was better as her anxiety level improved.  The ALJ also acknowledged Sutherland's voluntary hospitalization, which included her self-reported suicide attempts, but he explained that Sutherland's stay was short and voluntary and alone did not rise to the

level required to meet the Listing.  Between visits, Sutherland
may have experienced some regression.  However, the ALJ was
required to consider the record in its entirety, and he explained
that the overall progression of her treatment revealed improve-
ment in her mental health and supported this conclusion by point-
ing to the improvement over the course of her treatment.

Sutherland is correct that the ALJ failed to discuss her GAF
scores.  The GAF scale measures a "clinician's judgment of the
individual's overall level of functioning." *Am. Psychiatric
Ass'n, Diagnosis and Statistical Manual of Mental Disorders*,
Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV-TR).  The
established procedures require a mental health professional to
assess an individual's current level of symptom severity and
current level of functioning, and adopt the lower of the two
scores as the final score.  *Id*. at 32-33.  A GAF score ranging
from 41-50 indicates serious symptoms; scores ranging from 51-60
indicate moderate symptoms; and scores ranging from 61-70 indi-
cate mild symptoms.  *Id.*

Sutherland received GAF scores ranging from 35 to 50.
Sutherland contends that, although not binding, the ALJ had an
affirmative duty to explain why he found contrary to the GAF
scores and did not find that her mental condition impaired her
ability to function and fulfill a job.  Although the ALJ did not

specifically mention the GAF scores, the scores were assigned at the beginning of her course of treatment. None of the physicians assigned Sutherland a GAF score after April 2008. The ALJ explained that Sutherland's condition improved in this time, and pointed to medical records supporting the same. GAF scores are not controlling, and here they were only discussed briefly and unsupported throughout the remainder of Sutherland's treatment. The ALJ was not required to cite to every piece of evidence in the record. Rather, the court must assess whether the ALJ provided adequate support and considered the record as a whole. Here, the ALJ relied on the medical notes, the absence thereof, and Sutherland's testimony to the contrary. The ALJ identified a pattern of improvement that contradicted the GAF scores and satisfied his duty to explain his finding.

Moreover, Sutherland has not shown how the additional medical evidence she pointed to would alter the outcome of her claim and satisfy the Paragraph B criteria. The ALJ concluded that the record was entirely devoid of any indication that Sutherland had difficulties in activities of daily living based on her reported activities. Sutherland stated that she could perform household chores, carry out her hobbies, and care for herself and her daughter. The additional evidence Sutherland points to does not

contradict this conclusion or point to any marked changes in her daily routines.

Sutherland also pointed to specific language in the medical records that detailed her anger.  However, the ALJ acknowledged that Sutherland experienced anger and accounted for this when he determined that Sutherland had mild limitations in social functioning.  Therefore, reconsideration would not alter the ALJ's finding under this prong.

With regard to persistence and pace, the ALJ also acknowledged that Sutherland experienced memory loss.  However, he was not required to take this as conclusory evidence that Sutherland had marked limitations under this prong.  Rather, the additional medical evidence explained that Sutherland was oriented and that her condition improved over time.  Sutherland's activities also suggested that she did not have severe limitations under this prong.  Sutherland could maintain her hobbies, perform household chores, and care for herself.  She has not cited to any additional evidence that suggests that she had a marked limitation under this prong.

The evidence that Sutherland references, if not contradicted by other evidence of record, may have affected the ALJ's finding under the fourth prong of the analysis.  The notes Sutherland has pointed to explained that she had flashbacks, nightmares, at-

tempted suicide, experienced crying spells, and had low GAF
scores.  These were self-reported incidents that arose early in
Sutherland's treatment and did not reflect the improvement the
doctors noted over the course of her treatment.  The ALJ ac-
counted for the effects of the flashbacks and nightmares by
acknowledging the disruptions in Sutherland's sleep.  Sutherland
did not report any attempts at suicide or crying spells following
her initial hospitalization.  Although the hospitalization was
evidence of decompensating, it was an isolated incident and was
not corroborated by any future treatment.  The ALJ accounted for
much of this evidence, and to the extent he ignored any of the
record Sutherland now points to, the evidence simply did not rise
to the severity necessary to meet the Paragraph B criteria.  The
ALJ provided a thorough explanation and acknowledged the evidence
to the contrary and was not required to cite to every quote that
indicated contrary to this finding.

Third, Sutherland contends the ALJ did not give proper
weight to her treating physician, Dr. Kim, who opined in August
2009 that Sutherland had marked limitations in her ability to
perform work-related mental activities.  A treating source's
opinion is entitled to controlling weight if the "opinion on the
issue(s) of the nature and severity of [the claimant's] impair-
ment(s) is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). *See also* **Schaaf v. Astrue**, 602 F.3d 869, 875 (7th Cir. 2010); **Gudgell v. Barnhart**, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." **Clifford v. Apfel**, 227 F.3d 863, 870 (7th Cir. 2000)(*quoting* **Scivally v. Sullivan**, 966 F.2d 1070, 1076 (7th Cir. 1992). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. 20 C.F.R. §404.1527(C)(2); **Clifford**, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions were inconsistent with his treatment notes or were contradicted by substantial evidence in the record, including the claimant's own testimony. **Schmidt v. Astrue,** 496 F.3d 833, 842 (7th Cir. 2007) ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for revising or reflecting evidence of disability."). *See*

*e.g.* **Latkowski v. Barnhart**, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); **Jacoby v. Barnhart**, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a special-ist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." **Hofslien v. Barn-hart**, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omit-ted).

Here, the ALJ rejected Dr. Kim's opinion that Sutherland had marked limitation because it was inconsistent with the record. In particular, Dr. Kim's opinion did not reflect Sutherland's well established daily activities and ability to function.  As the ALJ noted throughout his opinion, Sutherland regularly worked with horses on her sister's farm, maintained a relationship with her boyfriend and daughter, gardened, and made artwork.  More importantly, the ALJ pointed to other treatment notes from Dr. Kim that showed Sutherland's mental condition had either improved or remained stable.  Sutherland characterizes the ALJ's reading of Dr. Kim's treatment notes as "selective" and "playing doctor." However, the ALJ did not "cherry pick" Dr. Kim's file to locate a

single treatment note contradicting Dr. Kim's ultimate opinion. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)(remanding because the ALJ relied on a single treatment note and disregarded all others). Rather, the ALJ pointed to numerous dates within Dr. Kim's treatment notes which displayed improvement in Sutherland's condition. The ALJ engaged in a discussion of both positive and negative treatment notes in order to build his reasoning. Therefore, the ALJ properly considered Dr. Kim's August 2009 report and the weight he assigned was not in error.

Sutherland also claims the ALJ failed to give adequate weight to two other treating physicians in the record: Dr. Garlapati and Dr. Ames. However, both of these doctors primarily treated Sutherland for her physical injuries, including the resulting pain. Because these records are not particularly relevant to the discussion of Sutherland's mental impairment, this issue does not warrant a review. It appears this discussion was raised to substantiate the claim that the ALJ did not properly weigh Sutherland's treating physicians altogether, thus making it clear that he failed to weigh Dr. Kim's August 2009 opinion. However, as already noted, the ALJ adequately explained why he rejected Dr. Kim's opinion and provided the substantial evidence necessary to support his conclusion. *Schaaf*, 602 F.3d at 875.

Finally, Sutherland contends the ALJ failed to provide a proper hypothetical question to the vocational expert. The hypothetical that an ALJ poses to a VE "ordinarily must include all limitations supported by medical evidence in the record," including limitations imposed by depression. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). However, the hypothetical need not include all of a claimant's alleged impairments. *See Jones v. Shalala*, 10 F.3d 522, 525 (7th Cir. 1993); *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540-41 (7th Cir. 1992). "All that is required is that the hypothetical question be supported by the medical evidence in the record." *Ehrhart*, 969 F.2d at 540.

The hypothetical question posed by the ALJ was proper because it reflected Sutherland's impairments to the extent that the ALJ found them supported by evidence in the record. *See Ehrhart*, 969 F.2d at 540. At step 2, the ALJ determined that Sutherland's mental impairments were not severe pursuant to Paragraph B standards. Although he did not find Sutherland's mental impairments to be severe, the ALJ stated that he incorporated Sutherland's mental impairments into his RFC findings. The RFC, therefore, reflected all the limitations imposed by Sutherland's physical and mental conditions. At the hearing, the ALJ posed a question to the VE that accurately reflected the ALJ's RFC find-

ing.  Therefore, the hypothetical posed to the VE included all of Sutherland's limitations, including those resulting from her mental impairments, to the extent they were supported by the medical findings.

The ALJ adequately articulated his reasoning for finding that Sutherland's mental impairments were not severe pursuant to Paragraph B.  The ALJ's findings were based on substantial evidence in the record, and he properly weighed Sutherland's treating physicians' opinions against the record as a whole.  Based on his proper analysis, the hypothetical presented to the vocational expert was sound and based on medical evidence in the record.  Accordingly, the ALJ did not err in the above analysis and his decision shall be **AFFIRMED.**

ENTERED this 15th day of March, 2012

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge